Filed 2/14/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059593 |
| v. | (Super. Ct. No. M-11361) |
| LARRY ALLEN JACKSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael F. Murray, Judge. Reversed and remanded with directions.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

A jury found Larry Allen Jackson to be a sexually violent predator (SVP) under the Sexually Violent Predator Act, Welfare and Institutions Code section 6600 et seq. (SVPA).[1] The trial court ordered him committed to the California Department of State Hospitals (DSH) for an indeterminate term.

Jackson argues the trial court prejudicially erred by granting the prosecution's motion to exclude Jackson's only SVP expert witness from testifying at trial. We agree and therefore reverse and remand to the trial court for a new SVP trial.

Based on the record before us, and applying California Supreme Court authority, we hold that in the context of SVP cases, in determining whether to exclude defense expert witness testimony, the trial court must consider both applicable statutory law, including relevant portions of the SVPA and the Civil Discovery Act of 2004 (Code Civ. Proc., § 2016.010 et seq.) (Civil Discovery Act) and the defendant's constitutional due process right to present such evidence. Here, the trial court's exclusion of critical defense expert testimony to rebut the testimony of the prosecution's two expert witnesses deprived Jackson of a fair trial.

## GENERAL OVERVIEW OF THE SVPA AND ITS INTERPLAY WITH THE CIVIL DISCOVERY ACT AND DUE PROCESS

The SVPA authorizes the indefinite involuntary civil commitment of persons found to be sexually violent predators after they conclude their prison terms. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646-647; *People v. McKee* (2010) 47 Cal.4th 1172, 1186-1187.) At trial on a commitment petition under the SVPA, the prosecution must prove three elements beyond a reasonable doubt: (1) the person has suffered a conviction of at least one qualifying "sexually violent offense"; (2) the person

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

has "a diagnosed mental disorder that makes the person a danger to the health and safety of others"; and (3) the mental disorder makes it likely the person will engage in future predatory acts of sexually violent criminal behavior if released from custody. (§ 6600; see §§ 6603, 6604; *People v. Shazier* (2014) 60 Cal.4th 109, 126; *People v. Yates* (2018) 25 Cal.App.5th 474, 477.)

The prosecution, therefore, must carry the burden of proving beyond a reasonable doubt "that because of a diagnosed mental disorder affecting the person's volitional or emotional control, '"it is likely that he or she will engage in sexually violent behavior" if released.' [Citations.] 'Likely,' in this context, does not mean more likely than not; instead, the standard of likelihood is met 'when "the person presents a substantial danger, that is, a serious and well-founded risk, that he or she will commit such crimes if free in the community."'" (*People v. Shazier, supra*, 60 Cal.4th at p. 126, italics omitted.)

A "'[d]iagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) "Expert testimony, specifically testimony regarding diagnosis of a current mental disorder, is an important element in an SVPA civil commitment proceeding." (*People v. Roa* (2017) 11 Cal.App.5th 428, 443.)

As our Supreme Court has explained in this context: "[E]xpert testimony is critical" because "the primary issue is not, as in a criminal trial, whether the individual committed certain acts, but rather involves a prediction about the individual's future behavior." (*People v. McKee, supra*, 47 Cal.4th at p. 1192.)

SVPA trials constitute special proceedings of a civil nature (*Moore v. Superior Court* (2010) 50 Cal.4th 802, 815), and the Civil Discovery Act applies (*People v. Landau* (2013) 214 Cal.App.4th 1, 25). Under the Civil Discovery Act, a party is permitted to retain and designate "expert trial witnesses." (Code Civ. Proc., §§ 2034.210-

3

2034.290). Section 6603, subdivision (a) of the SVPA authorizes expert witness discovery, and provides that "a person subject to commitment under the [SVPA] has . . . *a right to retain experts or professionals* to perform examinations on his or her behalf—and . . . also has a *right to present the resulting evidence to the jury*." (*Albertson v. Superior Court* (2001) 25 Cal.4th 796, 803, italics added; see also *People v. Superior Court* (*Smith*) (2018) 6 Cal.5th 457, 463.)

A defendant in an SVP proceeding is entitled to due process protections because civil commitment involves a significant restraint on liberty. (*Moore v. Superior Court, supra*, 50 Cal.4th at p. 818; see *People v. Force* (2019) 39 Cal.App.5th 506, 514 [the defendant in SVP proceedings "has a constitutional right to present a defense, which includes calling witnesses in his favor and testifying on his own behalf"].) As explained by a panel of this court in *People v. Landau, supra*, 214 Cal.App.4th at pages 27-28: "'[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. [Citations.]' [Citation.] The 'most elemental of liberty interests' protected by the due process clause is 'the interest in being free from physical detention by one's own government. [Citations.]' [Citation.] 'Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'" In *People v. Otto* (2001) 26 Cal.4th 200, 210 (*Otto*), the California Supreme Court identified and applied factors that determine the extent of process due to such a defendant.

If the jury unanimously finds the defendant to be an SVP, then the defendant is committed for an indeterminate term to the custody of the DSH. (§ 6604.) Following commitment, the SVP is subject to annual mental examinations to determine whether he or she continues to meet the definition of an SVP. (§ 6604.9, subds. (a) & (b).)

## FACTS AND PROCEDURAL HISTORY

## I.

### DEFENSE EXPERT PREPARES REPORT FOLLOWING EVALUATION OF JACKSON, AND JACKSON SERVES DESIGNATION OF EXPERT WITNESS.

In June 2007, the Orange County District Attorney filed a fourth petition under the SVPA to commit Jackson as an SVP, which is the operative pleading in this matter. After extensive litigation not relevant to the issue presented in this appeal, trial was set for November 2019. In anticipation of trial, defense expert Dr. Christopher J. Fisher prepared a report in accordance with section 6600 et seq. following the completion of his psychological evaluation of Jackson (the September 2019 report). In his report, Dr. Fisher concluded that Jackson did not qualify as an SVP because he did not "have a diagnosed mental disorder that predisposed him to the commission of criminal acts" and was unlikely "to engage in sexually violent predatory criminal behavior as a result of his diagnosed mental disorder without appropriate treatment and custody."

In December 2019, trial was continued to February 18, 2020. In anticipation of trial, in early January, the parties exchanged expert witness designations. The prosecution designated Dr. Douglas Korpi and Dr. Robert Owen as positive state SVP evaluators. Jackson served a notice designating only Dr. Fisher as the defense SVP expert witness, stating Dr. Fisher "will testify regarding his evaluation of Mr. Jackson and discuss areas including, but not limited to, diagnosis, risk to reoffend, volitional control, whether Mr. Jackson can be safely treated in an outpatient setting, whether he meets the criteria as a Sexually Violent Predator, recidivism, and more."

The following week, the prosecution served a subpoena and notice of taking Dr. Fisher's deposition and a request for the production of documents.

## II.

### TRIAL IS CONTINUED TO JULY; JACKSON RE-SERVES HIS EXPERT WITNESS DESIGNATION.

At the end of January, the prosecution filed its first motion to continue the jury trial on the ground one of the prosecution's two expert witnesses, Dr. Korpi, had informed the prosecution that his opinion that Jackson is an SVP had changed from positive to negative. The prosecution also requested that the trial court order Dr. Korpi to conduct an updated evaluation. The trial court granted the prosecution's motion, ordered Dr. Korpi to complete an updated evaluation, continued trial until July 13, 2020, and "reset all discovery timelines." On January 31, the prosecution cancelled Dr. Fisher's deposition as noticed.

In May 2020, Jackson re-served his expert witness designation and declaration identifying Dr. Fisher as his sole expert witness.

## III.

### IN JUNE 2020, THE PROSECUTION INFORMS THE TRIAL COURT OF DELAYS REGARDING ITS SECOND EXPERT WITNESS.

At a pretrial hearing on June 5, 2020, the prosecution informed the trial court that Dr. Korpi had conducted an updated SVP evaluation of Jackson in March and thereafter confirmed his original positive opinion that Jackson qualified as an SVP. The prosecution also advised the trial court, however, that the prosecution's other SVP expert (Dr. Owen) had retired in May, resulting in the designation of a replacement evaluator. The replacement evaluator, however, had recently declared a conflict in the case. The prosecution's request for another replacement SVP evaluator was pending. The prosecution advised the trial court that, as a result of these developments, it did not appear likely the prosecution would be ready for trial as scheduled on July 13.

The trial court did not continue trial at that time, but acknowledged the prosecution's challenges and informed the parties "'you will not go out the 13th. You

6

might go out a couple months of that'" and that "'at the end of the day it is going to be delayed for every single case,' due to the COVID-19 Global Pandemic."

## IV.

### THE TRIAL COURT GRANTS THE PROSECUTION'S SECOND MOTION TO CONTINUE TRIAL AND RESETS DISCOVERY AGAIN.

The following week, the prosecution filed its second motion to continue the trial. This time, it was brought on the ground that the prosecution needed time to obtain subpoenaed "necessary and essential records" that the new evaluator for the prosecution, Dr. Craig King, had reviewed in his evaluation of Jackson. At the hearing on the motion, the trial court stated it was inclined to grant a brief continuance of the trial given the prosecution's entitlement to the subpoenaed records and the possibility Jackson would want to depose Dr. King.

Over Jackson's objection, the trial court continued trial to August 3, warning the parties: "[Y]ou should get your witnesses lined up. You will be going." The trial court and counsel thereafter engaged in the following discussion:

"[The prosecutor]: I'm going to do that as soon as I'm done here, your Honor. I am going to ask the court to reset discovery, also, so that I can include Dr. King in the People's—

"The Court: So reset.

"[A]re you going to waive any discovery time line issues so you can get everything as quickly as possible? Otherwise, it's supposed to be a 90-day time line, and we're well within that.

"[Defense counsel]: Well, it's—yes.

"The Court: You understand what I'm saying?

"[Defense counsel]: I do.

7

"The Court: We can go and splice that into each one of the pieces and parcels as to what that turns into, but at this point if you just waive them generically, we can get to the point where you can share everything and get this done.

"[Defense counsel]: Yes, within reason.

"The Court: Of course. If something changes, come and bring it to me."

## V.

### THE PROSECUTION SERVES A DEMAND FOR EXCHANGE OF EXPERT WITNESS INFORMATION AND AN EXPERT WITNESS DESIGNATION AND DECLARATION.

On July 14, 2020, the prosecution served a demand for exchange of expert information, requesting the mutual exchange of expert information on August 3 (the date then set for trial). On July 31, the prosecution served its "Exchange of Expert Information," identifying Dr. Korpi and Dr. King as the expert witnesses the prosecution intended to call at trial.

## VI.

### AFTER JACKSON DOES NOT RE-SERVE HIS EXPERT WITNESS DESIGNATION BUT INCLUDES DR. FISHER ON HIS WITNESS LIST, THE PROSECUTION MOVES IN LIMINE TO HAVE DR. FISHER EXCLUDED FROM TESTIFYING AT TRIAL.

Jackson did not re-serve his expert witness designation and declaration by August 3. Instead, three days later, he served his witness list, which included Dr. Fisher. In response, the prosecution filed a motion in limine seeking to exclude Dr. Fisher from testifying at trial. The prosecution argued exclusion was the only remedy under Code of Civil Procedure section 2034.300 to address Jackson's failure to comply with the expert exchange requirement.

At the hearing on the motion, the trial court confirmed that Jackson had already served expert witness declarations designating Dr. Fisher twice, first in January and again in May. The prosecutor informed the trial court that if Dr. Fisher was not excluded, he wanted to depose Dr. Fisher and wanted to do so before the jury was

8

selected. The prosecutor said Dr. Fisher's testimony could affect how the prosecution would conduct voir dire and present its case-in-chief.

The trial court deferred ruling on the motion in limine pending the parties' success in deposing Dr. Fisher during scheduled days off from trial later that month. The trial court opted to move ahead with jury selection and opening statements before Dr. Fisher's deposition could be taken.[2]

The prosecutor asked if there was any additional information that defense counsel needed to provide to the prosecution; defense counsel indicated there was none. The prosecutor confirmed with defense counsel that the September 2019 report was the only report Dr. Fisher had produced and that the information stated in that report was still what Dr. Fisher was going to rely on and testify to at trial.

After defense counsel later confirmed that Dr. Fisher would be available to sit for a remote deposition on August 26, 2020, the prosecution served a subpoena and notice of Dr. Fisher's deposition. They included a demand that Dr. Fisher produce written notes, documents, and/or recordings that he prepared in relation to or pertaining to his interview of Jackson.

## VII.

### THE PROSECUTION'S CASE-IN-CHIEF[3]

From August 11, 2020 through August 24, 2020, a jury was selected and the prosecution presented most of its case-in-chief by calling as witnesses five victims of Jackson's molestations, a retired investigator, and the prosecution's two expert witnesses.

---

[2] The prosecution confirmed that Dr. Korpi would be available to testify on rebuttal after Dr. Fisher testified at trial.

[3] The trial evidence of Jackson's prior sex offenses is not at issue in this appeal. This section contains a brief summary of the facts for the purpose of providing general background.

The evidence presented showed that in the late 1970's, Jackson lived with his brother, his brother's wife, and his brother's three young stepdaughters who were all under the age of 10 years. On several occasions, Jackson sexually molested the young girls. In 1979, Jackson pleaded guilty to one count of annoying or molesting children in violation of former Penal Code section 647a against the oldest child, T., and was sentenced to three years' probation.

In the mid-1980's, Jackson lived with a mother, her two sons, and her three-year-old daughter B.; Jackson molested B. over the course of two years. In August 1984, Jackson molested a five-year-old girl who had visited the family with her mother. In 1988, Jackson pleaded guilty to two counts of violating Penal Code section 288, subdivision (a) (lewd and lascivious acts with a child under the age of 14) against B. and was sentenced to 10 years in prison.

In January 1994, Jackson was invited to move in with a friend who had a four-year-old daughter. Jackson molested that child, too. In that case, Jackson pleaded guilty to one count of committing a lewd and lascivious act against a child under 14 years of age in violation of Penal Code section 288, subdivision (a), and was sentenced to three years in prison.

Jackson suffered probation and parole violations.

The prosecution also offered Dr. King's and Dr. Korpi's expert witness testimony that then 67-year-old Jackson met all the criteria for qualifying as an SVP.

## VIII.

### ON THE EVE OF DR. FISHER'S DEPOSITION, DEFENSE COUNSEL DISCLOSES DR. FISHER HAD MET WITH JACKSON IN FEBRUARY 2020; DR. FISHER PRODUCES NOTES FROM THAT MEETING.

The prosecution had almost completed its case-in-chief at the time of Dr. Fisher's deposition. The afternoon before that deposition, defense counsel sent an email to the prosecutor stating the following:

10

"Hello [the prosecutor],

"I talked with Dr. Fisher briefly and he let me know that he saw Mr. Jackson on February 20, 2020 for a short period of time to discuss his offenses. He admitted to the two qualifying and T[.] There is no other information: He did not write an addendum and was not paid to see him the second time. I guess he was seeing other patients at CSH.

"Thanks,

"[Defense counsel]."

On August 26, 2020, the prosecutor began the remote deposition of Dr. Fisher during which the prosecutor concluded that many of the representations made by defense counsel in her email were contradicted by Dr. Fisher's testimony. Among other things, Dr. Fisher said he had pages of notes relating to his February 2020 interview of Jackson and the interview was conducted in part at defense counsel's direction.

At the deposition, Dr. Fisher testified:

"Q. When did you relay to [defense counsel] that you had spoken with Mr. Jackson again?

"A. I know we discussed it yesterday. I don't recall if I had told her—I know we discussed previously, like in January or February, about the idea of me interviewing him again, and then I did go and interview him again on February 20th of this year.

"I don't recall when I would have relayed that information to [defense counsel] or if I ever explicitly did. I think I probably did, actually, but I couldn't tell you when. I don't know.

"Q. Do you normally write a report and then do a follow-up interview and not relay the fact that you interviewed someone to the attorney who retained you?

"[¶] . . . [¶]

"A. No. That would not be my normal process."

11

The prosecutor asked Dr. Fisher why he met with Jackson to discuss offenses Jackson had already denied committing. Dr. Fisher testified: "So I was already at Coalinga State Hospital that week seeing a number of other patients, and [defense counsel] and I had communicated about my initial interview with him and the report that I had already written at that point, and we had discussed his denial of his offenses to me, and then [defense counsel] let me know that she felt like his explanation of his offenses might have evolved and changed over the—what was it—five months or so since I had last seen him or six months. [¶] And so that's why I set up another interview with him, and it—initially, the motivation was just to discuss his offenses. The interview took a couple of other turns as well, and we didn't only discuss his offenses, although that was the primary motivation at the beginning."

Dr. Fisher thus confirmed he met with Jackson at defense counsel's prompting and that he met with Jackson for an hour and took notes that had not been produced even to defense counsel. He did not write a report after that meeting. Dr. Fisher stated that, within a few weeks or a month after the interview, he had informed defense counsel of it. Dr. Fisher testified he assumed this information would come out during his deposition and at trial. He added that nothing in those interviews changed his ultimate opinions as outlined in the September 2019 report, and that if anything, they only "kind of strengthened my opinions."

The prosecutor stated he felt he was at a disadvantage, having received the information about the February 2020 interview on the day of the deposition. Dr. Fisher sent the prosecutor "about two pages worth" of handwritten notes that he had taken regarding the February 2020 interview. Dr. Fisher confirmed he had not yet billed for the hour-long interview in February 2020, but that he intended to do so.

The prosecutor proceeded to depose Dr. Fisher on his opinions on the SVP criteria as they applied to Jackson. Dr. Fisher testified that Jackson's age (67 years) is a protective factor and "the most mitigating factor." He testified that a diagnosis of

12

pedophilic disorder is not automatically a permanent diagnosis. Dr. Fisher stated that in the 1970's through the 1990's, Jackson likely met the criteria for the diagnosis, but that he did not believe he met the criteria in 2020.[4]

After three hours, the prosecutor stopped the deposition. He stated he had only budgeted three hours for it and had defense counsel given him the information about the February 2020 interview, he could have been prepared instead of spending one of the three hours sorting out what had happened. It is unclear whether the prosecutor had any further questions for Dr. Fisher before concluding the deposition.

## IX.

### THE TRIAL COURT GRANTS THE PROSECUTION'S MOTION SEEKING TO EXCLUDE DR. FISHER'S TESTIMONY AT TRIAL.

On August 31, 2020, the prosecution filed another motion to exclude Dr. Fisher from testifying. This time, the prosecution sought exclusion of Dr. Fisher's expert testimony at trial because Jackson had "fail[ed] to participate in a properly demanded Expert Exchange" and had "intentionally mispresent[ed] discovery compliance regarding properly demanded discovery pursuant to a deposition subpoena after the court determined [the People] would be afforded the opportunity to depose [Jackson's] undeclared expert witness after the jury trial had begun and after [the People] had effectively completed putting on [its] case-in-chief."

At the hearing, defense counsel opposed the prosecution's motion by arguing:

---

[4] Dr. Fisher further testified at his deposition that "there aren't any studies, not a single one, that point to men of the age of 67 or older as serious and well-founded recidivism risk[s] even if they have multiple prior sex offenses." He clarified that it is not impossible for men of older age to reoffend, but with age, that risk becomes highly unlikely, particularly because Jackson's last offense occurred in 1994. Dr. Fisher also clarified that his opinion was not premised on the notion Jackson had not committed the sex offenses and that he had not taken Jackson at his word when, in September 2019, he denied committing those offenses.

13

- Defense counsel had already disclosed Dr. Fisher as the defense expert witness after the initial trial setting and the "whole purpose" of the most recent exchange of expert witness information was to enable the prosecution to designate newly assigned evaluator Dr. King as an expert for the prosecution;

- The prosecution's notice of deposition itself did not require production of requested documents three days before Dr. Fisher's deposition;

- Dr. Fisher produced the requested documents at the deposition in compliance with the notice;

- Defense counsel thought she had sent the prosecutor an email informing him of Dr. Fisher's February 2020 meeting with Jackson, but when she could not find such an email, she disclosed that information, admittedly later than she should have;[5]

- Although she did not plan to ask Dr. Fisher at trial about Jackson's admission of the sex offenses, she recognized that that information might be relevant for cross-examination, but then believed the issue had become "moot" in March 2020 when Jackson admitted to Dr. Korpi he had committed the sex offenses;

- The trial court should impose a lesser sanction such as the exclusion of evidence regarding Dr. Fisher's 2020 interview, a late discovery instruction, and/or the reopening of Dr. King's direct examination; and

- None of Dr. Fisher's diagnostic impressions and risk assessments had changed, and what Dr. Fisher testified to at his deposition was the same information presented in the September 2019 report.

The prosecutor argued that nothing short of the remedy of witness preclusion would be fair to address Jackson's discovery violations: "The People's

---

[5] At the hearing, defense counsel stated: "[I]t's 100 percent my error, your Honor . . . . When I didn't see an email, I figured that I needed to disclose it at that time, and it's my error."

14

whole strategy with this trial would have been different had I known that this was, for one, at [defense counsel's] direction that all of a sudden her client is copping, not some internal growth but a tactic legally. . . . Would have completely impacted whether the People would have brought any of the statements of Jackson in had he known at the end of his case, virtually, . . . by the way the defense expert is going to completely agree and say that he cops to everything." The prosecutor further argued it was impossible to "unring the bell" after he had already brought in unspecified statements by Jackson through the prosecution's expert witnesses: "Had the People known about what Mr. Jackson had said to Dr. Fisher, it would have enormously impacted on whether any of Mr. Jackson's statements would have been brought in through the People's experts in the first place. So [defense counsel's] suggestion that that somehow makes the People whole is absurd. It's absurd."

The trial court granted the prosecution's motion to exclude Dr. Fisher's expert testimony at trial: "The problem that the court has is, as the People have indicated, they can't unring that bell. The approach that they took on the case was premised on the information that they had regarding Dr. Fisher, and the only published for discovery information they had was on a report that predated his interview of February 20th, 2020, with the defendant where I find that there was a material change in information provided by your client. That information was not disclosed, nor was there an expert exchange as was required under [Code of Civil Procedure] 2034.300. [¶] The court made its best efforts to try and conduct the trial and provide the petitioner with the opportunity to conduct a deposition mid trial. I find through no fault of the petitioner that there was a repeated discovery violation and a failure to provide information regarding updated information that Dr. Fisher had considered and relied upon, that that discovery violation continued up to and through last Thursday's attempt at deposing Dr. Fisher, and that that has put the People in a completely untenable position such that there is no other remedy than the remedy called for in [Code of Civil Procedure section] 2034.300, and that is to

15

strike Dr. Fisher as a testifying witness for [Jackson]. [¶] So he is hereby stricken from [Jackson's] witness list, and he will not be permitted to testify. [¶] The court further orders reimbursement to petitioner, $600 for deposition costs, $1,270.52 for an expedited transcript of that deposition, for a total cost of $1,870.52 due to petitioner."

Defense counsel immediately moved for a mistrial on the grounds that Jackson had rights under the 6th and 14th Amendments to the United States Constitution in the SVP proceeding and specifically had a right to an expert at trial. The trial court denied the motion.

## X.

### THE JURY FINDS JACKSON TO BE AN SVP AND THE TRIAL COURT DENIES JACKSON'S MOTION FOR A NEW TRIAL.

In September 2020, a jury found Jackson to be an SVP within the meaning of the SVPA. In October 2020, Jackson filed a motion for a new trial on the ground the trial court erred by granting the prosecution's motion seeking to exclude Dr. Fisher as an expert witness; the trial court denied the motion on the ground nothing had changed since the court excluded Dr. Fisher from testifying at trial.

In October 2020, the trial court ordered Jackson committed to Coalinga State Hospital for an indeterminate term. Jackson appealed.

## DISCUSSION

### I.

### BACKGROUND

Citing section 2034.300 of the Code of Civil Procedure, the trial court precluded Jackson's expert witness from testifying at trial because defense counsel had failed to timely (1) re-serve an expert designation after trial was continued and discovery was reset in July 2020; (2) disclose to the prosecution Dr. Fisher's February 2020 meeting with Jackson at which Jackson first admitted to Dr. Fisher that he had committed

16

the two qualifying prior sex offenses and his sex abuse of T.; and (3) produce to the prosecution the notes Dr. Fisher took regarding that February 2020 meeting with Jackson.

Section 2034.300 of the Code of Civil Procedure provides in relevant part that "on objection of any party who has made a complete and timely compliance with Section 2034.260, the trial court *shall* exclude from evidence the expert opinion of any witness that is offered by any party who has *unreasonably* failed to do any of the following:  [¶] (a) List that witness as an expert under Section 2034.260.  [¶] (b) Submit an expert witness declaration.  [¶] [or] (c) Produce reports and writings of expert witnesses under Section 2034.270."  (Italics added.)

Here, Jackson had identified Dr. Fisher as an expert witness for trial and submitted an expert witness declaration regarding Dr. Fisher in January 2020, before the February 2020 trial date, and again in May 2020, before the July trial date.  However, he did not re-serve those documents on the prosecution after the trial court granted the prosecution's second motion to continue the trial to August and "reset discovery."  In its motion, the prosecution argued that Dr. Fisher's expert testimony must be excluded from trial by operation of Code of Civil Procedure section 2034.300.

In an effort to avoid Jackson's forfeiture of his sole expert witness at trial, the trial court deferred ruling on the prosecution's motion seeking to exclude Dr. Fisher from testifying at trial and fashioned a "nonstatutory remedy" of providing the prosecution the opportunity to depose Dr. Fisher during a scheduled break in the prosecution's case-in-chief.  The trial court denied the prosecution's request that Dr. Fisher's deposition be scheduled before jury selection.

The trial court ultimately granted the prosecution's originally sought-after relief of excluding Dr. Fisher's testimony after the prosecution learned that Dr. Fisher, in February 2020, had had an hour-long conversation with Jackson during which Jackson first admitted committing the qualifying sex offenses and the sex offense against T.  At the deposition, the prosecution received a three-page document containing Dr. Fisher's

17

handwritten notes about that conversation. Presented with this information of delayed disclosures, the trial court concluded there was no other possible appropriate remedy but to exclude Dr. Fisher's trial testimony under section 2034.300 of the Code of Civil Procedure.

It is true Jackson failed to re-serve his expert witness designation in July or August 2020 after the trial was again continued and the prosecution served a demand for an exchange of expert information. And there is no dispute that defense counsel did not disclose Dr. Fisher's 2020 conversation with Jackson or Dr. Fisher's attendant notes until Dr. Fisher's deposition was held during a break in the trial toward the end of the prosecution's case-in-chief.

Jackson argues any discovery violations were not unreasonable under the circumstances of this case within the meaning of section 2034.300, and the trial court abused its discretion by precluding Dr. Fisher's testimony as a discovery sanction. (*Landau v. Superior Court, supra*, 32 Cal.App.5th at p. 1080 ["We generally review discovery orders for an abuse of discretion"].) We do not need to evaluate whether Jackson's discovery violations were reasonable under the statute because even if they were unreasonable, our analysis does not end. Instead, we must consider statutory rights conferred by the SVPA as well constitutional rights that attach in SVP proceedings in evaluating Jackson's contention of error.

## II.
### SECTION 6603, THE RIGHT TO DUE PROCESS IN SVP PROCEEDINGS, AND THE *OTTO* FACTORS.

"Pursuant to section 6603, subdivision (a),[6] a person subject to commitment under the [SVPA] has a right to counsel and *a right to retain experts or*

---

6 Section 6603, subdivision (a) provides in part: "A person subject to this article is entitled to a trial by jury, to the assistance of counsel, *to the right to retain experts or professional persons to perform an examination on the person's behalf*, and to have access to all relevant medical and psychological records and reports." (Italics added.)

18

*professionals* to perform examinations on his or her behalf—and of course he or she also has a *right to present the resulting evidence to the jury*." (*Albertson v. Superior Court, supra,* 25 Cal.4th at p. 803, italics added; see also *People v. Superior Court* (*Smith*), *supra*, 6 Cal.5th at p. 463.) Civil commitment in SVP proceedings inherently involves a significant restraint on the defendant's liberty. Therefore, a defendant in such a proceeding "is entitled to certain due process protections." (*Moore v. Superior Court, supra*, 50 Cal.4th at p. 818.)

With regard to due process, the California Supreme Court has explained: "[P]roceedings under the SVPA, in common with proceedings under other civil commitment statutes, are civil proceedings with consequences comparable to a criminal conviction—involuntary commitment, often for an indefinite or renewable period, with associated damage to the defendant's name and reputation." (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1192 (*Hurtado*); see *People v. Force, supra*, 39 Cal.App.5th at p. 514, fn. 2 [SVP proceedings "are rooted in criminal convictions and therefore retain the due process rights associated with criminal trials," affording defendants in such proceedings a constitutional right to present a defense, which includes calling witnesses in his favor and testifying on his own behalf].) In *Hurtado, supra*, 28 Cal.4th at pages 1192-1194, the California Supreme Court recognized that California courts have relied on burden of proof decisions to hold that the standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) applies to federal constitutional error in civil commitment proceedings. Under the high standard of *Chapman*, federal constitutional error is reversible unless shown to be harmless beyond a reasonable doubt. (*Ibid.*) The *Hurtado* court concluded that the *Chapman* standard "necessarily governs review under the SVPA." (*Hurtado, supra*, at p. 1194.) We therefore apply the standard of *Chapman, supra*, 386 U.S. 18 here.

Upon concluding that a defendant in an SVP proceeding is entitled to due process protections, "'the question remains what process is due.'" (*Otto, supra*, 26

Cal.4th at p. 210.)  In *Otto*, the Supreme Court identified the following four factors (the *Otto* factors) to be considered and applied in making that determination:  "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (4) the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official."  (*Ibid.*)

## III.

### APPLICATION OF THE *OTTO* FACTORS ESTABLISHES THE DEFENDANT'S DUE PROCESS RIGHT TO PRESENT EXPERT WITNESS TESTIMONY AT AN SVP TRIAL.

The parties have cited no published legal authority specifically addressing what process is due in the context of expert witness testimony preclusion in SVP trials, and we have found none.[7]  Applying the *Otto* factors here, first, we conclude there is no question that "the private interests that will be affected by [a civil commitment under the SVPA] are significant limitations on [the defendant's] liberty, the stigma of being

---

[7]  In *People v. McKee, supra*, 47 Cal.4th at page 1192, the California Supreme Court addressed an SVP's due process interest in having the assistance of an expert witness in the SVP's effort to petition the trial court under former section 6608 for his or her release from civil commitment.  The court observed:  "If the state involuntarily commits someone on the basis of expert opinion about future dangerousness, places the burden on that person to disprove future dangerousness, and then makes it difficult for him to access his own expert because of his indigence to challenge his continuing commitment, that schema would indeed raise a serious due process concern."  (*Ibid.*)  Explaining "[w]e construe statutes when reasonable to avoid difficult constitutional issues," the Supreme Court held:  "Given that the denial of access to expert opinion when an indigent individual petitions on his or her own to be released may pose a significant obstacle to ensuring that only those meeting SVP commitment criteria remain committed, we construe section 6608, subdivision (a) . . . to mandate appointment of an expert for an indigent SVP who petitions the court for release."  (*Id.* at p 1193.)  As so interpreted, the court concluded former section 6608 did not violate the due process clause.  (*Ibid.*)

20

classified as an SVP, and subjection to unwanted treatment." (*Otto, supra*, 26 Cal.4th at p. 210.)

Second, we consider the risk of an erroneous deprivation of such interests through the procedures used, and the probable value, if any, of any additional or substitute safeguards. The preclusion of expert testimony on behalf of the defense would seriously limit the defendant's ability to respond to the prosecution's expert testimony.

If the only defense expert witness is precluded from testifying, there would be no expert witness to rebut the prosecution's experts' testimony that the defendant has a diagnosed mental disorder that would make him a danger to the health and safety of others and would make it likely he will engage in future predatory acts of sexually violent criminal behavior if released from custody. (See *People v. McKee, supra*, 47 Cal.4th at p. 1192 [expert witness testimony "is critical in an SVP commitment proceeding"]; see also *Ake v. Oklahoma* (1985) 470 U.S. 68, 81 ["Psychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness"].)

Third, the SVPA "articulates the strong government interest in protecting the public from those who are dangerous and mentally ill." (*Otto, supra*, 26 Cal.4th at p. 214.) Recognizing that a defendant in an SVP proceeding has a due process right to critical expert witness testimony does not interfere with the strong government interest in protecting the public. Defense expert testimony may show that the defendant is not an SVP. The government has no interest in protecting the public from non-SVP's.

Finally, we consider whether a right to have an expert witness testify for the defense is necessary to safeguard a defendant's "dignitary interest" in an SVP proceeding. (*Otto, supra*, 26 Cal.4th at p. 210.) The *Otto* court explained that a person subject to the SPVA has a "dignitary interest in being informed of the nature, grounds, and consequences of the SVP commitment proceeding" and in "presenting his side of the

21

story before a responsible government official." (*Id.* at p. 215.) If the trial court precludes a defendant's expert witness from testifying at an SVP trial, it is hard to see how the defendant can present his or her side of the story of whether the defendant is an SVP and whether it is likely the defendant would engage in future predatory acts of sexually violent criminal behavior if released from custody.

Having considered and applied the *Otto* factors, we conclude a defendant in an SVP proceeding has a due process right to present expert witness testimony at trial. (*People v. Angulo* (2005) 129 Cal.App.4th 1349, 1361 ["Due process in an SVPA proceeding is satisfied where 'the defendant has the opportunity to thoroughly present his side of the story'"]; *People v. Superior Court* (*Howard*) (1999) 70 Cal.App.4th 136, 154 [due process under the SVPA is preserved when the mandated proceedings provide the defendant "the opportunity to thoroughly present his side of the story"].)

## IV.

### SECTION 2034.300 OF THE CODE OF CIVIL PROCEDURE CANNOT BE APPLIED WITHOUT CONSIDERATION OF WELFARE AND INSTITUTIONS CODE SECTION 6603, SUBDIVISION (a) AND THE DEFENDANT'S DUE PROCESS RIGHT TO PRESENT EXPERT WITNESS TESTIMONY IN AN SVP TRIAL.

Before and during trial, the prosecution argued that if a party is found to have unreasonably violated expert witness disclosure requirements, section 2034.300 of the Code of Civil Procedure commands that "the trial court *shall* exclude from evidence the expert opinion of any witness." (Italics added.) In other words, the prosecution argued that upon finding a party unreasonably violated certain disclosure requirements, the trial court is *compelled* to exclude that party's expert witness from testifying at trial.

It is true a defendant in an SVP proceeding cannot be free to circumvent applicable discovery statutes, given the government's strong interest in protecting the public from those who are dangerous to others. (See *Otto, supra*, 26 Cal.4th at p. 214.) Even a defendant in a criminal action must comply with discovery rules. However, "[p]reclusion sanctions may be imposed against a criminal defendant only for the most

egregious discovery abuse. Specifically, such sanctions should be reserved to those cases in which the record demonstrates a willful and deliberation violation which was motivated by a desire to obtain a tactical advantage at trial such as the plan to present fabricated testimony." (*People v. Edwards* (1993) 17 Cal.App.4th 1248, 1263.)[8]

But here, the trial court read the word "shall" in section 2034.300 of the Code of Civil Procedure in a vacuum. Even assuming for purposes of our analysis that Jackson's discovery violations were unreasonable, this reading directly conflicts with (1) Jackson's specific right in this SVP proceeding to present an expert witness at trial under section 6603, subdivision (a), and (2) his constitutional due process right to present such evidence and be provided the opportunity to tell his side of the story. Given this conflict, consideration of the applicability section 2034.300 of the Code of Civil Procedure in evaluating the trial court's expert witness preclusion order is necessarily only the start of the analysis and not, as argued by the prosecution, the end.

## V.

### THE TRIAL COURT'S ORDER EXCLUDING DR. FISHER'S TRIAL TESTIMONY VIOLATED JACKSON'S RIGHT TO DUE PROCESS AND CONSTITUTED PREJUDICIAL ERROR.

Applying due process principles discussed *ante* to the record before us, we conclude the trial court for several reasons erred by selecting the preclusion of Dr. Fisher's expert witness testimony as the remedy for Jackson's discovery violations. We do not regard this issue as a close one.

The Supreme Court has explained that, generally speaking, the civil discovery statutes "were intended to curtail surprises, enable each side to learn as much as possible about the strengths and weakness of its case," and thereby facilitate, among

---

[8] It is well established that in a criminal case, the defendant has the due process right to the assistance of expert witnesses. (*Ake v. Oklahoma, supra*, 470 U.S. at pp. 83, 87, fn. 13.) "'The Sixth and Fourteenth Amendments to the United States Constitution also guarantee a defendant's right to present the testimony of these expert witnesses at trial.'" (*People v. Nieves* (2021) 11 Cal.5th 404, 449.)

23

other things, efficient trials. (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 543. fn. 3, italics omitted.) Here, any argument that the prosecution was taken by surprise that Jackson intended to call Dr. Fisher as his expert witness at trial, or was in any way prejudiced simply because Jackson did not re-serve his expert witness designation a third time within a seven-month period, strains credulity.

The record shows: (1) Dr. Fisher had evaluated Jackson and produced the September 2019 report; (2) in January 2020, Jackson first served his expert witness designation and declaration identifying Dr. Fisher as his sole expert witness (neither the prosecution at trial nor the Attorney General on appeal have suggested that Jackson's expert witness designation and declaration were in any way deficient); (3) in May 2020, Jackson re-served his expert witness designation and declaration naming Dr. Fisher as his sole expert witness; (4) although Jackson did not respond by August 3 to the prosecution's most recent demand for an exchange of expert witness information, three days after his response was due, Jackson served his trial witness list which included Dr. Fisher; and (5) the prosecution had the opportunity to and did take Dr. Fisher's deposition and obtained all requested documents from Dr. Fisher before concluding its case-in-chief at trial.

The prosecution argued that the disclosure of Dr. Fisher's February 2020 meeting with Jackson (and related notes) during his deposition taken in the midst of trial also compelled the exclusion of Dr. Fisher's testimony. Defense counsel acknowledged that she should have disclosed Dr. Fisher's February 2020 conversation with Jackson sooner than she did, and she agreed she should have produced Dr. Fisher's notes related to that conversation three days before his deposition. For several reasons, the record does not support the prosecution's claims of undue prejudice as a result of the delayed disclosures, or that absolute expert witness preclusion would be an appropriate—much less a necessary—sanction under the circumstances of the case.

24

First, although Dr. Fisher's meeting with Jackson in February 2020 was generally undisclosed until the eve of Dr. Fisher's deposition, the only "new" information gained from that meeting was that Jackson admitted for the first time to Dr. Fisher that he had committed the underlying sex offenses.[9]

Second, shortly after his February 2020 conversation with Dr. Fisher, Jackson admitted committing the same sex offenses directly to Dr. Korpi during his updated evaluation of Jackson in March 2020, and to Dr. King during his June 2020 evaluation of Jackson. Therefore, the prosecution was well aware, as early as March 2020, that Jackson had jettisoned his past denials and admitted he had committed those sex offenses.

Third, Dr. Fisher's expert opinion, as explained in the September 2019 report and during his deposition, encompassed opinions on several central issues at trial, including whether Jackson had a mental illness that made him dangerous and likely to reoffend. When and whether Jackson had admitted or denied qualifying offenses or other sex offenses to Dr. Fisher was at most a relatively small aspect of the scope of Dr. Fisher's proposed expert witness trial testimony.

Fourth, the prosecutor proceeded to take Dr. Fisher's deposition as scheduled and did not identify any information he was unable to discover during that deposition as a result of the delayed disclosures.

Fifth, the deposition occurred while the prosecution was still presenting its case-in-chief and while one of its experts, Dr. Korpi, was still under redirect examination. The record does not show why the delayed disclosures were not remediable by simply eliciting further expert testimony from the prosecution's experts.

In support of his request that the trial court exclude Dr. Fisher's testimony, the prosecutor argued in general terms that, had he known of the February 2020 meeting

---

[9] Although Jackson had pleaded guilty to several of the offenses, he had previously denied committing them to Dr. Fisher.

25

and Jackson's admissions before trial, he would have structured his entire case-in-chief differently and would not have had to elicit Jackson's statements denying he committed the qualifying sex offenses through his own experts. The prosecutor never explained *how* he would have changed his presentation, what statements he had to elicit, or why either fact caused the prosecution undue prejudice.

Defense counsel proposed that the trial court issue a different sanction such as a jury instruction on late disclosure or the preclusion of evidence regarding the February 2020 meeting. The trial court declined imposing any other sanctions and instead selected the nuclear option of excluding Jackson's sole expert witness from testifying at all at trial. This ruling forced Jackson to proceed at trial without any expert witness testimony to rebut the testimony of the prosecution's two expert witness, Dr. Korpi and Dr. King, on the dispositive issues at trial.

The trial court's ruling preventing Jackson from presenting any expert witness testimony in his defense at trial denied Jackson constitutional due process. We cannot conclude the trial court's error was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at pp. 22-24.) The Attorney General cannot dispute that Dr. Fisher's expert testimony was relevant, material, and crucial to the defense. Nor can he dispute that the preclusion of that testimony significantly curtailed Jackson's right to present his side of the story. Indeed, it is fair to say that without expert testimony to challenge the prosecution's two expert witnesses, Jackson had no chance of prevailing at trial. Jackson is entitled to a new trial.

Nothing in this opinion is intended to suggest that the preclusion of a defense expert witness from an SVP trial is always reversible error. Instead, the Civil Discovery Act must be applied in each SVP proceeding in light of section 6603 and the constitutional due process rights at stake. Using the analytical framework we have described, rulings are reviewed on a case-by-case basis.

Because we reverse and remand to the trial court for a new trial, we do not need to address Jackson's other contentions of error that he received ineffective assistance of counsel and that the trial court erred by denying his motion for a continuance and motion for a new trial.

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial on all issues.


                                        FYBEL, J.
WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

27